IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Austin Kenny, | ) | C/A No. 3:21-1321-MGL-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Janet Yellen, *Secretary, U.S. Department of the Treasury*, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Austin Kenny filed this employment action pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on the defendant's motion for summary judgment.[1] (ECF No. 26.) Kenny filed a response in opposition to the motion (ECF No. 33), and the defendant filed a reply (ECF No. 41). Having reviewed the record presented and the applicable law, the court concludes that the defendant's motion should be denied.

---

[1] In their pleadings, the parties expressly debate whether venue is proper according to Title VII's enforcement provisions. (Compare Compl., ECF No. 1 with Ans., ECF No. 7 (both discussing 42 U.S.C. § 2000e-5(f)(3))). However, the Rehabilitation Act appears to limit its incorporation of those provisions to Rehabilitation Act claims under Section 501. See 29 U.S.C. § 794a(a)(1). Because the plaintiff expressly brings only Section 504 claims, Title VII's special venue provisions do not apply here. Cf. 29 U.S.C. § 794a(a)(2) (discussing the remedies for Section 504 violations and incorporating the enforcement procedures of 42 U.S.C. §§ 2000d, et seq., which, unlike § 2000e-5, do not contain a special venue provision); see, e.g., Bailey v. Bd. of Comm'r of La. Stadium & Exposition Dist., 484 F. Supp. 3d 346, 354 (E.D. La. 2020), aff'd sub nom. Bailey v. France, 852 F. App'x 852 (5th Cir. 2021) (finding venue was proper under § 1391(b) for the plaintiff's claim under § 794). Consequently, venue appears to be proper under 28 U.S.C. § 1391(e). Moreover, even if venue were improper, the defendant has waived any venue challenge by failing to litigate it before this stage of the case. See Misch on Behalf of Est. of Misch v. Zee Enterprises, Inc., 879 F.2d 628, 631-32 (9th Cir. 1989) (agreeing that "when a party files a motion for summary judgment prior to filing a motion to dismiss for improper venue, such action constitutes a tacit admission on the part of the movant that the court has personal jurisdiction, that venue is properly laid there, and that the court should dispose of the case on its merits").

## BACKGROUND

The following facts are either undisputed or are taken in the light most favorable to the plaintiff, to the extent they find support in the record.  Kenny has Crohn's disease, which causes serious intestinal issues during unpredictable flare-ups that vary in severity and duration.  The disease causes symptoms such as pain, fatigue, diarrhea, arthritis, fever, chills, and vision problems.  The flare-ups can last anywhere from two days to two weeks.  The disease can also cause intestinal blockages that require surgery.  Kenny has had two such surgeries since he was diagnosed with Crohn's disease in 2000—the first in 2007 and the second in 2019 while working for the Internal Revenue Service ("IRS").

On September 3, 2018, the IRS hired Kenny as a GS-14 project manager in the Enterprise Program Management Office ("EPMO") in Charlotte, North Carolina.  Kenny lived near Columbia, South Carolina at that time, which meant that his commute to the office required driving ninety-nine miles each way.  The EPMO was responsible for upgrading the programming code for the tax information system, a major IRS-wide project.  As a project manager, Kenny was responsible for managing the project schedule between multiple stakeholders to ensure the project was progressing on time.  Though his worksite was at an IRS office in Charlotte, no other EPMO employee worked there, and Kenny worked entirely through remote means such as Web-Ex and phone communication.  At first, Kenny worked a traditional work schedule of five days per week and eight hours per day.  But soon thereafter, he transitioned to an alternative work schedule of four days per week for ten hours per day.

Kenny's manager in the EPMO project was Monique Queen, who assigned work to Kenny, but Robert Buckstad was responsible for administrative matters related to Kenny's employment, such as leave requests.  Kenny spoke to Buckstad about Kenny's disability early on in his

employment—in September or early October 2018.  Kenny informed Buckstad that the commute to Charlotte was exacerbating his Crohn's symptoms, especially considering that the commute was lengthy and his flare-ups were unpredictable.  Buckstad relayed that information to Gbemi Acholonu, an upper manager in the EPMO project and the official responsible for reviewing and approving accommodation requests.  Buckstad told Acholonu that he was looking into transferring Kenny to an IRS office closer to Kenny's home to mitigate the symptoms caused by Kenny's commute to Charlotte.

On October 30, 2018, Kenny formally requested an accommodation.  Kenny requested that his worksite be changed from Charlotte to Columbia and that he be allowed to telework from home as needed.  Buckstad submitted a memorandum in support of Kenny's request which explained that allowing Kenny to work closer to his medical network and telework as necessary would improve Kenny's productivity with no adverse effect to the IRS.  Cynthia Washington was assigned to be the reasonable accommodation coordinator for Kenny's request.  Buckstad and Washington submitted paperwork and made preliminary arrangements to transfer Kenny's worksite to Columbia.

However, the decision as to whether to grant the accommodation request rested with Acholonu.  In email exchanges with Buckstad in November and December 2018, Acholonu and Queen expressed reluctance to grant Kenny's accommodation request because he was still within the one-year probationary employment status and could be fired without cause.  Queen told Buckstad that he would face questions about "why are you allowing a person with pre-existing conditions make changes [*sic*] and not a long standing employee that situation [*sic*] just changed." (Ex. 11, Pl.'s Resp., ECF No. 33-12 at 3.)  Queen noted that other employees had "pre-existing conditions" before accepting their jobs and asked, "Should I make accommodations for them as

well before their probation is up?  In my opinion, this will open up the flood gates [*sic*] and we will have the wild wild west and then I will want a change in POD ["Post of Duty"] and fulltime telework."  (Id.)  Queen asserted that Kenny and other new employees "are on 1 year probation and can be dismissed at any time without cause if they are not working out . . . .  I was always told should [*sic*] never give such a generous accommodation for someone during probation period [*sic*] since you are not sure they are going to work out."  (Id.)  Queen stated that other employees had "things happening in their lives" where accommodations could have been approved but that those employees were provided with other assistance and those employees "put in their time, without a sense of entailment [*sic*]."  (Id.)  In a different email chain, Acholonu directed Buckstad to justify Kenny's request, referring to Kenny's disability as a "preexisting condition at the time he applied for the job" and noted that he had been employed for less than six months.  (Ex. 9, Pl.'s Resp., ECF No. 33-10 at 2.)  Acholonu also compared Kenny's request to the request of another employee who had "proven, sustainable service."  (Id.)

In another email chain, Buckstad informed Queen and Acholonu that Kenny intended to work from home on a day the Charlotte office was closed due to inclement weather.  Queen responded that Kenny did not have an approved telework agreement and needed to take administrative leave.  (Ex. 12, Pl.'s Resp., ECF No. 33-13 at 3.)  Queen also stated, "Remember once we allow telework, the door is open and cannot [*sic*] close it" and stated this was an example of Kenny's receiving "special allowances that no other new employee is receiving."  (Id.)  Buckstad replied that Kenny already had the software necessary for remote work; Acholonu replied that "[o]ur employees are not to work telework [*sic*] for any reason during their 1st year." (Id. at 2.)

On December 21, 2018, Queen disciplined Kenny by issuing an "evaluative recordation" by email. The evaluative recordation noted that Kenny took thirty minutes to respond to an urgent message (via instant message and text message) from Queen on December 19 and that he missed a December 20 meeting.

On February 5, 2019, Acholonu met with Washington, the reasonable accommodation coordinator, to discuss Kenny's request for an accommodation. In the meeting, Acholonu noted that Kenny was a probationary employee, but Washington responded that probationary employees are entitled to reasonable accommodations. Acholonu requested a medical assessment be completed by Federal Occupational Health ("FOH") before a decision was made on Kenny's request. Acholonu relayed the request for a medical assessment to Kenny and Buckstad. Around that time, Kenny had a flare-up which caused a blockage in his intestines that required surgery. On February 25, 2019, despite having not yet received the medical assessment she requested, Acholonu denied Kenny's request to change worksites, though she stated she would revisit that request after he completed his probationary period. Acholonu noted that Kenny was already granted an alternative work schedule to minimize his trips to the office and that she would be open to switching his off-days as needed. Acholonu also stated that Kenny would be granted the ability to work from home until March 11 as directed by Kenny's doctor, apparently in light of this recent flare-up.

The FOH medical assessment was issued on April 11, 2019. The physician who performed the assessment explained that a change in workstations would decrease Kenny's commute time and allow him to conserve energy. The physician also explained that Kenny is incapacitated during flare-ups, and thus teleworking would not help him during such times. The physician found it would be reasonable to allow Kenny to *attempt* to telework four days per month during flare-ups

but if he was incapacitated, that Kenny would need to take leave.  The physician noted that Kenny's recent medical documents showed that he had flare-ups every month that lasted approximately four days.  (Ex. E, Def.'s Mot. Summ. J., ECF No. 28-4 at 4.)

On April 30, Acholonu again refused to allow Kenny to change workstations to Columbia. Acholonu instead offered Kenny the ability to telework from home two days per week (or half of Kenny's workweek under his four-day alternative work week schedule).  Kenny stated Acholonu's offer did not meet his needs, explaining that his flare-ups were unpredictable and he would not know in advance when he needed to telework.

Acholonu, Kenny, and Washington met on May 7, 2019.  Acholonu offered Kenny the ability to telework from home three of four days per week through September 2019 and apparently mentioned that because there was no IT presence in the Columbia office, Kenny needed to report to the Charlotte office where he was originally assigned.  Kenny took the offer under advisement but rejected the offer two days later on May 9, 2019, and indicated that he would appeal Acholonu's denial of his request for an accommodation.

On May 15, Queen issued another evaluative recordation to Kenny by email, disciplining him for failing to keep management informed of Kenny's project status.  Queen asserted that between November 2018 and March 2019 Kenny failed to schedule bi-weekly meetings with management to provide project updates.  Kenny replied that Queen was wrong, he had scheduled and held those meetings, and retorted that any fault for not receiving updates was on management since management did not attend the meetings.

On May 20, Queen emailed Acholonu a list of reasons to terminate Kenny, citing Kenny's purported inability to manage the project schedule and communicate effectively with management, among other things.  Over two days, Queen and Acholonu edited the list through emails.  Later on

May 20, Kenny emailed a project update to Queen.  Queen replied the next morning, "Wow!  Such a massive brain dump for management to navigate through.  Is this meant to be a replacement for the bi-weekly meetings (requested since March) that have not occurred?"  (Ex. 18, Pl.'s Resp., ECF No. 33-19 at 4.)  Queen directed Kenny to instead schedule a meeting with management to provide an update.  Kenny replied that his email was a well-intended effort to update management and that he felt Queen's reply email, and other emails she had recently sent him, were harassing and bullying.  Kenny copied Washington and Buckstad on his reply.  On May 22, Buckstad emailed Acholonu and Queen recommending that they meet with Kenny to discuss his performance issues and reasonable accommodation request.  Acholonu replied, "Please stand down.  No further discussion is warranted from you."  (Ex. 22, Pl.'s Resp., ECF No. 33-21 at 2.)

Acholonu terminated Kenny's employment by letter dated June 11, 2019.  The letter cited many reasons for his termination:  (1) failure to respond to Queen's urgent request and the missed meeting that Queen cited in the first evaluative recordation; (2) failure to keep "managers and customers apprised of project status and pending changes," which was cited in the second evaluative recordation; (3) failure "to monitor the status of assigned work being produced by the contractors," citing Kenny's May 20 email to Queen; (4) failure "to proactively guide junior team members on expectations and preparation to back-fill in the event of absences," citing several dates without further detail; (5) failure "to proactively communicate to delivery partners needed data points and the impact of missing deliverables ahead of due dates;" (6) failure "to provide deliverables that met management's expectations," citing the lack of meetings to provide updates to management; and (7) failure to "display a strong commitment to ensure the successful completion of tasks and the project," explaining that Kenny missed more than half of "key scheduling activities on new end-date [*sic*] for Congressional reporting project" and his

"participation and reporting status in the re-planning efforts were minimal as the government lead." (Ex. 21, Pl.'s Resp., ECF No. 33-22 at 2-3.) The letter noted that the purpose of the probationary period is to determine an employee's fitness for his position and stated that Kenny failed his probationary period.

After pursuing a remedy with the Equal Employment Office, Kenny brought this action pursuant to Section 504 of the Rehabilitation Act asserting claims of discriminatory discharge, retaliation, and failure to accommodate.

## DISCUSSION

### A.     Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact.*" Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.    Methods of Proof in Employment Cases**

In most cases, a plaintiff asserting a claim of unlawful employment discrimination proceeds through one of two avenues of proof. First, he may attempt directly to prove discrimination with direct or circumstantial evidence. Alternatively, when direct proof is lacking, a plaintiff may proceed under the McDonnell Douglas burden-shifting framework. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Hannah P. v. Coats, 916 F.3d 327, 342 (4th Cir. 2019) (applying the McDonnell Douglas burden-shifting framework to Rehabilitation Act discrimination claims). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a

legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[], but [was] a pretext for discrimination." Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be

considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

## C.     Kenny's Claims

Kenny's Complaint expressly raises each of his claims pursuant to Section 504 of the Rehabilitation Act, which prohibits discrimination against individuals with disabilities under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a); see also Little v. FBI, 1 F.3d 255, 257-58 (4th Cir. 1993) (assuming without deciding that a federal employee may raise a claim pursuant to Section 504). Employment discrimination claims brought under Section 504 are evaluated using many of the same standards as those applied to such claims brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. See 29 U.S.C. § 794(d).

### 1.     Discriminatory Discharge

To establish a discriminatory discharge claim under the Rehabilitation Act, the plaintiff must show (1) that he has a disability; (2) that he is otherwise qualified for the employment; and (3) that he was terminated due to discrimination solely on the basis of his disability. Hannah P. v. Coats, 916 F.3d 327, 342 (4th Cir. 2019); Reyazuddin v. Montgomery Cnty., Md., 789 F.3d 407, 418 (4th Cir. 2015) (citing Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995)). Whether the plaintiff was "otherwise qualified" turns on whether he could "perform the essential functions" of his position "with or without reasonable accommodation" from his employer. Reyazuddin, 789 F.3d at 419; 42 U.S.C. § 12111(8). In the case at bar, the defendant challenges only the third element.

Here, Kenny has forecast sufficient evidence from which a reasonable jury could find that he was terminated solely because of his Crohn's disease. Specifically, Kenny relies upon Queen's and Acholonu's comments—made specifically in connection with his accommodation request—about Kenny's having a sense of entitlement and a "pre-existing condition," as well as receiving special allowances. Kenny also points out that Queen and Acholonu disciplined him and decided to terminate him just days after Kenny rejected their offered accommodation. Notably, Acholonu's statements that the defendant did not have to accommodate new employees with pre-existing conditions conflicts with the Rehabilitation Act. Compare 29 U.S.C. § 794(a), (d); 42 U.S.C. § 12111 (defining employee and qualified individual without providing a tenure requirement) with 29 U.S.C. § 2611(2)(A) (defining an "eligible employee" under the Family Medical Leave Act as an employee who has been employed "(i) for at least 12 months by the employer to whom leave is requested . . ." and "(ii) for at least 1,250 hours of service with such employer during the previous 12-month period."); cf. Acosta v. Hilton Worldwide, No. 4:15-CV-00495-RBH, 2015 WL 5231730, at *3 (D.S.C. Sept. 8, 2015) ("Generally, an at-will employee may be terminated at any time for any reason or for no reason, with or without cause, subject to narrow exceptions and prohibitions against illegal discrimination").

Alternatively, applying the McDonell Douglas framework, the defendant argues that it provided legitimate, nondiscriminatory reasons for terminating Kenny, and that Kenny cannot show that those reasons were mere pretext for discrimination or retaliation. However, the court concludes that on this record, Kenny has met his burden, even if the framework rather than direct evidence is used.

As noted above, viewed in the light most favorable to Kenny, Queen and Acholonu were dismissive of Kenny's attempts to continue working despite his disability, referring to his disability

as a "pre-existing condition" and questioning why they should make accommodations for a new employee who was still in a probationary period and could be fired at will.  Queen implied that Kenny had a sense of entitlement because he was seeking an accommodation before he "put in [his] time."  (Ex. 11, Pl.'s Resp., ECF No. 33-12 at 3.)  Queen referred to Kenny's attempts to work from home as "special allowances" because he was a new employee.  (Ex. 12, Pl.'s Resp., ECF No. 33-13 at 3.)

The discriminatory attitude conveyed by these comments is further supported by Acholonu's and Queen's actions in terminating Kenny—and, as discussed below, in their dealings with him through the interactive process prior to his termination.  For example, Kenny submitted medical documentation to Queen and Acholonu showing that his lengthy commute was making his symptoms worse and more difficult to manage, including the FOH assessment by an independent physician.    Kenny's administrative manager, Buckstad, also submitted a memorandum explaining why changing Kenny's workstation to Columbia would accommodate his disability *and* improve his work performance and availability.   Yet, despite the FOH assessment and the support of Kenny's administrative manager, Acholonu refused to allow him to change his duty station, expressing statements that suggested discriminatory animus to a new hire with a disability.  Once Kenny rejected the final proffered accommodation, Acholonu and Queen wrote him up for apparently doing his job the same way he always had.  Cf. Merritt v. Old Dominion Freight, 601 F.3d 289, 299 (4th Cir. 2010) (Title VII) (recognizing that a belatedly proffered reason can be probative of pretext).  And, within days of Kenny's expressed intent to appeal their denial of his requested accommodation, they fired him, citing reasons that a jury could reasonably find to be fabricated to get rid of a disabled employee they perceived as "entitled."  Cf. Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 730 (4th Cir. 2019) (finding that even if the

defendant honestly believed the plaintiff violated company policy, the jury could still reasonably infer that the company used the violation as pretext for discrimination "based on the nature of her violation, her 30-year history of satisfactory work, the severity of [the defendant's] response, the company officials' contradictory statements regarding the seriousness of her violation, and her additional circumstantial evidence of age discrimination"); Govan v. Caterpillar, Inc., 899 F. Supp. 2d 445 (D.S.C. 2012) (Title VII) (finding a genuine issue of material fact as to whether a pregnant employee's termination was motivated by animus on the basis of sex in light of supervisors' and managers' statements evincing frustration with the number of pregnancies of the employee during her tenure); Carter v. Ascend Performance Materials Holdings, Inc., C/A No. 8:20-4379-TMC-KFM, 2022 WL 5434288, at *18 (D.S.C. May 20, 2022), adopted by, 2022 WL 4463021 (D.S.C. Sept. 26, 2022) (finding a reasonable jury could find the defendant's proffered reason for termination was not honestly believed and was pretext for discrimination based on other evidence, "including evidence appearing to show that the plaintiff had been satisfactorily performing her job, the severity of the defendants' response after the plaintiff explained that she had in fact only been to one physical therapy session due to her inability to afford the treatment," as well as other circumstantial evidence).  The record here permits a reasonable inference that Acholonu and Queen began making up reasons to get rid of Kenny.

Thus, the record contains sufficient evidence, either direct or via the McDonnell Douglas proof framework, permitting a reasonable finding that the defendant fired Kenny solely because of his Crohn's disease.

2.    **Retaliation**

Similarly, the record forecast here would permit a reasonable jury to conclude that but for Kenny's protected activity, he would not have been written up and, ultimately, terminated.  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013) (Title VII) ("[R]etaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."); Staley v. Gruenberg, 575 F. App'x 153, 155-56 (4th Cir. 2014) (applying but-for causation in an ADA retaliation case).  To establish a retaliation claim under the Rehabilitation Act, the plaintiff must show (1) he engaged in a protected activity; (2) his employer acted adversely against him; and (3) his protected activity was causally connected to his employer's adverse action.  Smith v. CSRA, 12 F.4th 396, 416 (4th Cir. 2021) (citing Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir. 2001) (ADA)).  Retaliation claims may also be analyzed under the McDonnell Douglas burden-shifting framework.  Reyazuddin, 789 F.3d at 419; Smith, 12 F.4th at 416.

"Protected activity" falls into one of two categories:  opposition or participation.  See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271 (2009).  To constitute protected opposition activity, a plaintiff must have conveyed to the employer a reasonable belief that the actions complained of violated federal law.  Jordan v. Alt. Res. Corp., 458 F.3d 332, 340-41 (4th Cir. 2006) (stating that "an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress") (citing Equal Emp't Comm'n v. Navy Fed. Credit Union, 424 F.3d 397 (4th Cir. 2005)); see also Netter v. Barnes, 908 F.3d 932, 937-38 (4th Cir. 2018) (discussing the standards for participation and opposition activity).  Moreover, to prove a causal connection, a

plaintiff asserting a retaliation claim must be able to show that his employer took the adverse action "*because* the plaintiff engaged in a protected activity." Holland, 487 F.3d at 218 (quoting Dowe v. Total Action Against Poverty in Roanoake Valley, 145 F.3d 653, 657 (4th Cir. 1998)). Thus, in a retaliation claim, a plaintiff must assert facts showing that the employer was aware of the protected activity. See Shield v. Fed. Express Corp., 120 F. App'x 956, 962 (4th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004)).

To establish the second element of a retaliation *prima facie* case, a plaintiff must show that the adverse action was objectively material. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). The United States Supreme Court has held in the context of Title VII that, unlike the adverse employment action element for a disparate treatment claim, the prohibition of adverse actions taken in retaliation for protected activity "is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 64. Rather, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. However, the anti-retaliation provision does not shield an employee from all retaliation, but rather only from retaliation that produces injury or harm. Id. Accordingly, to fall within the provision's protection, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). A plaintiff must show material adversity to separate the significant harms from the trivial, as federal anti-discrimination statutes do "not set forth 'a general civility code for the American workplace.' " White, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). The test is an objective one and considers the reactions of a reasonable employee. White, 548 U.S. at 68.

Further, "[c]ontext matters," and the significance of the adverse action must be analyzed under the circumstances particular to the plaintiff. See id. at 69. Thus, "an 'act that would be immaterial in some situations is material in others.' " Id. (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 661 (7th Cir. 2005)). The standard analyzes the challenged retaliatory act, not the underlying conduct that gave rise to the complaint of discrimination. White, 548 U.S. at 69. The question is whether the challenged action was material from the perspective of a reasonable person in the plaintiff's position. Id. at 69-70.

Here, a jury could reasonably find that Kenny was terminated in retaliation for insisting on a reasonable accommodation and for opposing Queen's perceived discriminatory behavior. In addition to the evidence discussed above from which a jury could reasonably find that Queen and Acholonu were hostile to Kenny's requested accommodations and refused to offer him accommodations that other, non-disabled employees used, Kenny presented evidence that Queen and Acholonu decided to fire Kenny nearly immediately after Kenny (1) rejected the defendant's final offered accommodation, (2) provided notice that he intended to appeal the refusal of his requested accommodation, and (3) notified them that he would seek recourse for Queen's conduct that he found to be hostile and retaliatory. See Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 126 (4th Cir. 2021) ("An adverse action that bears sufficient temporal proximity to a protected activity may, along with the existence of other facts, suggest that the adverse employment action occurred because of the protected activity.").

Queen disciplined Kenny with an evaluative recordation only six days after Kenny rejected the defendant's final offered accommodation, which later formed the basis for his termination. See, e.g., Martin v. Sunlight Fin., LLC, No. 3:20-CV-725-MOC-WCM, 2021 WL 3009018, at *2-3 (W.D.N.C. July 15, 2021) ("It is well settled that a negative performance review or a performance

improvement plan alone will not constitute materially adverse action . . . . Rather, a performance improvement plan is only actionable as a form of retaliation if the employer relies upon it to later take additional action, such as discharging or demoting the employee.") (quotation marks and citations omitted) (collecting cases).  In the evaluative recordation, Queen accused Kenny of failing to schedule meetings to keep management informed of his project status.  This is also one of the bases cited in Acholonu's letter terminating Kenny.  See, e.g., Emami v. Bolden, 241 F. Supp. 3d 673, 686 (E.D. Va. 2017) (finding that four days is a short enough time period "that a reasonable juror could infer a causal link between an instance of protected activity and a materially adverse employment action based on temporal proximity").  Notably, Queen faulted Kenny for failing to schedule the meetings over a six-month period, but the first time she raised that issue to Kenny was through a disciplinary action six days after Kenny informed Queen and Acholonu that he would appeal the denial of his accommodation request.  The temporal proximity, along with the statements evincing hostility to Kenny's disability accommodation requests and the failure to raise the same performance deficiency before Kenny engaged in protected activity, permits a reasonable inference of retaliation.

The record also contains evidence permitting a reasonable inference that Queen's accusations were factually baseless.  (Ex. 18, Pl.'s Resp., ECF No. 33-18 at 3); cf. Merritt, 601 F.3d at 294 (discussing that proffered reasons which are unsupported can be evidence of pretext). Five days after the evaluative recordation, Queen and Acholonu began compiling a list of reasons to terminate Kenny, including Kenny's purported failure to keep management informed of his project.  That same day, when Kenny emailed Queen a project status update, Queen criticized it as a "massive brain dump" and directed Kenny to schedule a meeting, even though she had already started the process of terminating Kenny.  Kenny, for his part, complained that he found Queen's

reply email to be harassing and retaliatory. And when Buckstad tried to intervene to work on the issues between Queen and Kenny and resolve Kenny's reasonable accommodation request, Acholonu told Buckstad to "stand down" and that "no further discussion is warranted" from Buckstad, even though Buckstad's job was to manage Kenny's administrative matters. (Ex. 22, Pl.'s Resp., ECF No. 33-21 at 2.) On this record, a reasonable jury could infer that, but for Kenny's protected activity in connection with his disability, Queen would not have written him up and commenced the termination process.

Further, Kenny has presented evidence permitting a reasonable inference of pretext. Acholonu's termination letter cited numerous performance-based reasons for Kenny's termination, which the defendant argues are legitimate, non-discriminatory bases for Kenny's termination. But again, Kenny provides evidence that those reasons were not legitimate. Where specific examples of performance failures are cited in the letter, most refer to the two evaluative recordations from Queen. But Kenny provided contemporaneous objections to the bases for those evaluative recordations—objections which have not been refuted and that a jury could reasonably credit and then infer that Queen's criticism was pretextual. For instance, Queen disciplined Kenny on December 21 because Kenny took thirty minutes to respond to an urgent message (via instant message and text message) from Queen on December 19. Kenny responded that he turned off alerts on his personal cell phone because he was at work but promised to leave his phone on in the future to receive her messages in a timely manner. Queen also noted that Kenny missed a meeting on December 20 and did not respond to Queen's instant message during the meeting. But the record contains evidence that they had previously discussed that Kenny would miss the meeting because he was performing other work and that he did not see a message from Queen during the

meeting.  (Ex. 13, Pl.'s Resp., ECF No. 33-14 at 2.)  And Kenny testified that he has never seen proof that Queen sent that message.  (Kenny Dep. 116, ECF No. 33-2 at 31.)

As previously discussed, Queen also disciplined Kenny in May—just after he rejected the defendant's final offered accommodation—for failing to keep management informed of Kenny's project status.  Queen asserted that Kenny failed to schedule bi-weekly meetings with management to provide management with updates between November 2018 and March 2019.  Kenny immediately responded that he had in fact been holding meetings and inviting management to them and attached Queen's calendar showing the meeting times.  An email from November shows that Kenny scheduled those meetings and invited Acholonu.  (Ex. 34, Pl.'s Resp., ECF No. 33-41 at 2.) Kenny noted that despite Queen's assertion that Kenny failed to provide her with crucial project updates for six months, she failed to reach out to Kenny and seek an update.  (Ex. 17, Pl.'s Resp., ECF No. 33-18 at 2.)  Regardless, Kenny attempted to rectify the situation by emailing her project updates a few days later but Queen responded with the "massive brain dump" email and told Kenny to schedule a meeting instead.  (Ex. 18, Pl.'s Resp., ECF No. 33-19 at 3-4.)

 As to the new bases for his termination for which he was not previously disciplined, the letter cited Kenny's failure to "proactively guide junior team member [*sic*] on expectations and preparation to back-fill in the event of absences."  (Ex. 21, Pl.'s Resp., ECF No. 33-22 at 3.)  But as Kenny points out, his job duties did not include management of "junior" team members and his absences were all unexpected because of his disease.  Therefore, the record permits a conclusion that fulfilling such requirements was not a genuinely held expectation.  Cf. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 518 (4th Cir. 2006) (indicating that the employer's expectations cannot be a "sham designed to hide the employer's discriminatory purpose").

The termination letter also asserted Kenny failed to deliver on specific projects or tasks that he was assigned, citing a "subpar" May 20 schedule created by Kenny that did not utilize his certifications and experience, a slide in a program planning session that was missing information, and that Kenny missed fifty percent of his scheduling activities.  (Ex. 21, Pl.'s Resp., ECF No. 33-22 at 2-3.)  Again, the record permits a conclusion of pretext, as Kenny testified that Queen gave him tasks that he could not complete and set him up to fail.  For instance, Kenny testified he was given assignments to compile information from contractors that he could not talk to because they had not signed the contract or from employees who were out on leave, but he would then be blamed for not meeting deadlines.  (Kenny Dep. 93-100, 122, 127-28, ECF No. 33-2 at 25-27, 33-34.)  Kenny also testified that Queen would give him assignments with limited instruction and no expectations.  (Id. at 91, 99, ECF No. 33-2 at 25, 27.)  Kenny further testified that he was not provided proper training or mentoring and the IRS lacked the proper guidance for him to be fully prepared to meet their expectations.  (Id. at 122-25, ECF No. 33-2 at 33.)  As to the accusation that he missed fifty percent of his scheduling activities, Kenny testified that accusation is false, citing the fact that he had daily meetings to talk about scheduling.  (Id. at 128-29, ECF No. 33-2 at 34.)

Although an employee's disagreement with his supervisor's perception of his performance cannot generally create a genuine issue of material fact, here, in light of the above evidence, a factfinder could reasonably conclude that the defendant's proffered reasons for terminating Kenny were actually false or were pretextually offered as the failure to adhere to expectations that were not genuinely held.  Therefore, the defendant fails to show it is entitled to judgment as a matter of law on Kenny's retaliation claim.

### 3.    Failure to Accommodate

The defendant argues that Kenny's failure to accommodate claim fails as a matter of law. To establish a *prima facie* failure-to-accommodate claim, a plaintiff must show that (1) he qualifies as an "individual with a disability" as defined in 29 U.S.C.A. § 705(20); (2) the employer had notice of his disability; (3) he could perform the essential functions of his job with a reasonable accommodation; and (4) the employer refused to make any reasonable accommodation. Reyazuddin v. Montgomery Cnty., Md., 789 F.3d 407, 414 (4th Cir. 2015) (citing 29 U.S.C. § 794(a)).[2]

A reasonable accommodation is one that is feasible or plausible. Reyazuddin, 789 F.3d at 414 (citing US Airways, Inc. v. Barnett, 535 U.S. 391, 402 (2002)). To survive summary judgment, the plaintiff need only present evidence from which a jury may infer that the proposed accommodation is reasonable on its face—that is, ordinarily or in the run of cases. Reyazuddin, 789 F.3d at 414 (quoting Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 464 (4th Cir. 2012)). The employer does not have to provide the exact accommodation requested by the employee. Hannah P. v. Coats, 916 F.3d 327, 338 (4th Cir. 2019). Instead, the employer may provide an alternative reasonable accommodation. Reyazuddin, 789 789 F.3d at 415-16. The employer may also avoid liability by showing that the employee's requested accommodation will cause undue hardship on the employer. Barnett, 535 U.S. at 401-02.

Here, the defendant argues that Kenny's requested accommodation was not reasonable because there was no vacant position in Columbia, and therefore, the defendant was not required to create a new position to accommodate Kenny. But this argument misconstrues Kenny's request.

---

[2] The McDonnell Douglas burden-shifting framework does not apply to failure-to-accommodate claims, which do not require evidence of discriminatory intent. Perdue v. Sanofi-Aventis U.S., LLC, 999 F.3d 954, 959 n.2 (4th Cir. 2021).

Even by the defendant's own account of the record, Kenny's request for a reasonable accommodation only requested a "Post of Duty" change, *i.e.*, a relocation of his workstation—not a new position. (Def.'s Mot. Summ. J., ECF No. 26 at 3.) Kenny never asserted that he could not perform his job; he asked only that he be allowed to work in a different office. And that request appears at least reasonable on its face because the record shows that Kenny worked "remotely" even when he worked out of the Charlotte office. No other EPMO employee worked at the IRS's Charlotte office, and therefore, Kenny could apparently have performed his job in the IRS's Columbia office. The FOH medical assessment physician and Buckstad even opined that Kenny's performance may have improved by moving to the Columbia office by reducing the effects of his disability and increasing his availability. (Ex. E, Def.'s Mot. Summ. J., ECF No. 28-4 at 4; Ex. 4, Pl.'s Resp., ECF No. 33-5 at 2.) The defendant points to no evidence to the contrary.[3] Therefore, Kenny has presented evidence from which a jury may infer that the proposed accommodation is reasonable on its face. See Reyazuddin, 789 F.3d at 414.

The defendant next argues that it offered a reasonable alternative accommodation, and thus it is entitled to summary judgment as a matter of law. The employer has the ultimate discretion to choose between effective accommodations and may choose the less expensive accommodation or an accommodation that is easier to provide. See Hannah P., 916 F.3d at 337; Reyazuddin, 789 F.3d at 415-16. But the defendant's offer only partially addressed Kenny's concerns about

---

[3] While the record contains a note from the May 7 meeting that Kenny needed to work in the Charlotte office because there was no IT presence in Columbia, the defendant does not cite to any evidence supporting that assertion and the record does not appear to include an explanation about what that meant. Regardless, even if Acholonu considered the presence of IT staff in Charlotte to be a requirement for Kenny to perform his job, her offer to allow Kenny to work from home three days per week contradicts any premise that Kenny needed IT staff near him to perform his job. At the very least, this is a question of fact that is not resolved by the record before the court.

commuting to Charlotte because it failed to provide the flexibility to telework from home that Kenny apparently needed, and it still required that he regularly commute to the Charlotte office instead of the Columbia office, which exacerbated his Crohn's symptoms. Thus, whether this accommodation would be effective is questionable. See Humphrey v. Mem'l Hosp. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001) ("An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position."); see also Reyazuddin, 789 F.3d at 407 (stating a reasonable accommodation should provide an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities). Accordingly, a question of material fact exists as to whether the defendant's alternative accommodation was reasonable. See Reyazuddin, 789 F.3d at 416 (stating that whether an accommodation is reasonable is a question of fact) (citing Pandazides v. Va. Bd. of Educ., 13 F.3d 823, 833 (4th Cir. 1994)); Clark v. Sch. Dist. Five of Lexington & Richland Cntys., 247 F. Supp. 3d 734, 744 (D.S.C. 2017) ("Generally, whether a proposed accommodation is reasonable is a question of fact.").

The defendant seeks to justify its refusal to provide Kenny the same accommodation by pointing out that only employees who had completed their first year of employment were allowed such a teleworking arrangement. However, the defendant provides no argument that providing the same arrangement to a disabled employee in his first year would not be feasible or cause an undue hardship, and the deposition testimony cited above indicates other employees received such accommodations for their disabilities. Contrary to Queen's and Acholonu's statements, the Rehabilitation Act does not have an exception for first-year employees. Cf. 29 U.S.C. § 2611(2)(A) (defining an "eligible employee" under the Family Medical Leave Act as an employee who has been employed "(i) for at least 12 months by the employer to whom leave is

requested . . ." and "(ii) for at least 1,250 hours of service with such employer during the previous 12-month period."). Additionally, as previously explained, Kenny worked remotely out of the Charlotte office anyway, and the defendant provides no evidence that Kenny could not have effectively done the same from the Columbia office. On this record, a reasonable jury could conclude that the defendant's offered accommodation was not reasonable. Consequently, the defendant's motion for summary judgment should be denied as to Kenny's failure to accommodate claim.

## RECOMMENDATION

Based on the foregoing, the court recommends the defendant's motion for summary judgment be denied. (ECF No. 26.)

December 8, 2022                          Paige J. Gossett
Columbia, South Carolina                 UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).